UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

SHELLY ALLEN,

      Plaintiff,

v.

LINCARE INC., a foreign corporation,

      Defendant.

_____/

Case No. 2:16-cv-11996

Hon.:  George Caram Steeh

Magistrate Judge:  Anthony P. Patti

NORMAN YATOOMA & ASSOCIATES, P.C.
By:    Norman Yatooma (P54746)
        Gavin J. Fleming (Of Counsel) (68366)
        Christine L. Constantino (P80719)
Attorneys for Plaintiff
1615 S. Telegraph Road
Bloomfield Hills, MI  48302
Phone No.:  (248) 481-2000
Email: nyatooma@normanyatooma.com
       gfleming@normanyatooma.com
       cconstantino@normanyatooma.com

WEISMAN, YOUNG & RUEMENAPP, P.C.
By:    John A. Ruemenapp (P34796)
Attorney for Defendant
30100 Telegraph Road, Suite 428
Bingham Farms, MI  48025
Phone No.:  (248) 258-2700
Fax No.:  (248) 258-8927
Email: jruemenapp@wyrpc.com

_____/

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................... v

INDEX OF EXHIBITS......................................................................................... vi

CONCISE STATEMENT OF ISSUES PRESENTED.................................................. vii

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

          The Parties and Background .............................................................. 1

          Allen's Employment With Lincare ...................................................... 2

          Attendance Policy At The Livonia Office .............................................. 3

          Allen's Attendance ......................................................................... 3

          Allen's Poor Attitude, Liability to Work With Others, Disrespect, Dishonesty, etc. ............................................................................. 6

          Allen's Complaints of Discrimination................................................... 8

          Allen's Termination......................................................................... 9

          Allen's EEOC Complaints ................................................................ 11

     ARGUMENT .............................................................................................. 11

      THE STANDARD FOR SUMMARY JUDGMENT ............................................ 11

LINCARE IS ENTITLED TO SUMMARY JUDGMENT ON ALLEN'S CLAIMS OF RACE DISCRIMINATION............................................................................... 13

      There Is No Direct Evidence Of Race Discrimination ......................... 14

      There Is No Circumstantial Evidence Of Race Discrimination............. 15

          Allen Cannot Establish A Prima Facie Case of Discrimination Because She Cannot Sustain the Fourth Element That She Was Treated Differently................................................................... 16

LINCARE IS ENTITLED TO SUMMARY JUDGMENT ON ALLEN'S CLAIMS FOR RETALIATION ........................................................................................... 19

      Allen Cannot Establish A Prima Facia Case of Retaliation................. 19

Allen Cannot Establish Pretext ................................................................. 23

LINCARE IS ENTITLED TO SUMMARY JUDGMENT ON ALLEN'S CLAIMS FOR
OVERTIME PAY AS ALLEN WAS AN EXEMPT, PROFESSIONAL EMPLOYEE . 24

The Duties Test ..................................................................................... 25

The Salary Based Test ......................................................................... 25

# INDEX OF AUTHORITIES

Cases

Adkins v. Wolever,
    554 F.3d 650 (6th Cir. 2009) .................................................................... 6
Amerson v. Waterford Twp.,
    562 Fed. Appx. 484, 488 (6th Cir. 2014)................................................ 12
Anderson v. Liberty Lobby,
    477 U.S. 242, 252, 106 S. Ct. 1505, 91 L.Ed.2d 202 (1986)................. 12
Balmer v. HCA, Inc.,
    423 F.3d 606 (6th Cir. 2005) ...................................................... 16, 19, 23
Blair v. Henry Filters, Inc.,
    505 F.3d 517, 523 (6th Cir. 2007) ......................................................... 14
Celotex Corp. v. Catrett,
    477 U.S. 317, 32. 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)................... 11
Clark County School District v. Breeden,
    532 U.S. 268, 274, 149 L.Ed.2d 509, 121 S. Ct. 1508 (2001)............... 21
Coble v. City of White House, Tenn.,
    634 F.3d 865, 870 (6th Cir. 2011) ......................................................... 12
DiCarlo v. Potter,
    358 F.3d 408 (6th Cir. 2004) .................................................................. 13
Dixon v. Neubacher,
    2015 U.S. Dist. LEXIS 41691 (ND Ohio, 2015)................................... 12
Frazier v. Richland Pub. Health,
    2017 U.S. App. LEXIS 6081; 685 Fed. Appx. 443 (6th Cir. 2017) ........ 21
Graves v. Dayton Gastroenterology, Inc.,
    657 Fed. Appx. 485 (6th Cir. 2016) ....................................................... 14
Hood v. Mercy Healthcare Arizona,
    23 F. Supp. 2d 1125 (D.C. Ariz. 1997)................................................... 25
Jackson v. Baxter International, Inc.,
    2007 U.S. Dist. LEXIS 92722 (N.D. Ohio 2007).................................. 20
Jackson v. Quantex Corp.,
    191 F.3d 647, 658 (6th Cir. 1999) ......................................................... 13
Johnson v Donahoe,
    642 Fed. Appx. 599 (6th Cir. 2016) ....................................................... 14
Johnson v. Kroger Co.,
    319 F.3d 858, 866 (6th Cir. 2003) .............................................. 16, 19, 23
Johnson v. University of Cincinnati,
    215 F.3d 561, 572 (6th Cir. 2000) ................................................... 13, 15
Kuivila v. City of Newton Falls,
    2016 U.S. Dist. LEXIS 17041 (N.D. Ohio 2016).................................. 21
Laster v. City of Kalamazoo,
    746 F.3d 714, 730 (6th Cir. 2014) ................................................... 19, 23
Manzer v. Diamond Shamrock Chemicals Company,
    29 F.3d 1078, 1081 (6th Cir. 1994) ....................................................... 13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .................................... 12
McDonnell Douglas Corp v. Green,
    411 U.S. 792, 36, L.Ed.2d 668, 93 S. Ct. 1817 (1973) ........................................ 13, 15, 23
McNeely v. Kroger,
    2014 U.S. Dist. LEXIS 97262 (E.D. Mich. 2014) ..................................................... 23
Mickey v. Zeidler Tool & Die Co.,
    516 F.3d 516, 525 (6th Cir. 2008) ................................................................ 21, 22
Moldowan v. City of Warren,
    578 F.3d 351, 374 (6th Cir. 2009) .................................................................... 12
Randolph v. Ohio Department of Youth Services,
    453 F.3d 724, 737 (6th Cir. 2006) ................................................................. 20, 21
Richardson v. Genesee County Community Mental Health Services,
    45 F.Supp. 2d 610, 615 (1999) ........................................................................ 25
Scott v. Harris,
    550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007) .................................... 12
Seeger v. Cincinnati Bell Telephone Company,
    681 F.3d 274, 283-84 (6th Cir. 2012) ................................................................ 21
Shafir v. Continuum Health Care Partners, Inc.,
    2016 U.S. Dist. LEXIS 5359 (D.C. New York 2016) ............................................. 27
Smith v. City of Salem Ohio,
    378 F.3d 566, 570 (6th Cir. 2004) .................................................................... 15
Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L.Ed.2d 207, 101 S. Ct. 1089
    (1981) ................................................................................................ 13, 15
University of Texas Southwestern Medical Center v. Nassar,
    ___ U.S. ___, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013) ................................. 20
White v. Columbus Metro Housing Authority,
    429 F.3d 232, 239 (6th Cir. 2005) .................................................................... 14
Wright v. Murray Guard, Inc.,
    455 F.3d 702, 707 (6th Cir. 2006) .................................................................... 15

Statutes

29 C.F.R. §541.301(e)(2) ..................................................................................... 25
29 C.F.R. §541.602(b) ......................................................................................... 27
29 C.F.R. §541.602(b)(1) ..................................................................................... 27
29 C.F.R. §541.604 ............................................................................................ 26
29 U.S. §201, ................................................................................................... 24
29 U.S.C. §213 ................................................................................................. 24
29 U.S.C. §213(a)(1) ......................................................................................... 25
42 U.S.C. §2000e-2(a)(1) .................................................................................... 13
MCL 37.2101 ................................................................................................... 13
MCL 408.381 ................................................................................................... 24
MCL 408.411 ................................................................................................... 24
MCL 408.414a(4) .............................................................................................. 24

Other Authorities

Fed. R. Civ. P. 56.............................................................................................................. 1
Fed. R. Civ. P. 56(a) ...................................................................................................... 11

**INDEX OF EXHIBITS**

| Number | Description |
|--------|-------------|
| 1 | Payroll Status Ticket |
| 2 | Earning Statements |
| 3 | Job Description |
| 4 | Employee Handbook |
| 5 | Manager's Evaluation – Trial Period |
| 6 | Employee's Evaluation – Trial Period |
| 7 | Walker Notes and Declaration |
| 8 | Medical Restriction Documents |
| 9 | Hyde Email – March 9, 2015 |
| 10 | Hyde Email – October 20, 2014 |
| 11 | Botello Notes and Declaration |
| 12 | Hyde Email – November 21, 2014 |
| 13 | Documented Verbal Warning |
| 14 | Hyde Email – December 3, 2014 |
| 15 | Allen Letter – January 28, 2015 |
| 16 | Hyde Email – December 29, 2014, Final Written Warning, Hyde Email – December 31, 2014 |
| 17 | Allen Letter – January 28, 2015 |
| 18 | Final Written Warning (Original and Amended) |
| 19 | Hyde Email – April 12, 2015 |
| 20 | Hyde Declaration |
| 21 | Hyde Email – October 23, 2014 |
| 22 | Allen Transcript Excerpts |
| 23 | Hyde Notes – November 26, 2014 |
| 24 | Hyde Notes – February 20, 2015 |
| 25 | Reassignment Documents |
| 26 | Nursing Study |
| 27 | Summary Judgment Opinion and Order in Allen v Henry Ford Health System |
| 28 | Complaint in Allen et al. v Dearborn |
| 29 | Hyde Email - December 29, 2014 |
| 30 | Allen Email – October 31, 2014 |
| 31 | Botello Notes – October 16, 2014 |
| 32 | Botello Notes – October 31, 2014 |
| 33 | EEOC Complaint - December 29, 2014 |
| 34 | Right to Sue Letter – June 9, 2015 |
| 35 | EEOC Complaint – July 15, 2015 |
| 36 | Right to Sue Letter – April 19, 2016 |
| 37 | Snider Final Written Warning |
| 38 | Allen Notes – December 1, 2014 |
| 39 | Allen Letter - February 23, 2015 |
| 40 | U.S. Wage and Hour Fact Sheet #17N |
| 41 | Unreported Cases |

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

Is Defendant entitled to summary judgment on Plaintiff's claim of discrimination because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law?

Is Defendant entitled to summary judgment on Plaintiff's claim of retaliation because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law?

Is Defendant entitled to summary judgment on Plaintiff's claim for overtime pay because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY
## FOR THE RELIEF SOUGHT

Fed. R. Civ. P. 56

Balmer v. HCA, Inc., 423 F.3d 606 (6th Cir. 2005)

Blair v. Henry Filters, Inc., 505 F.3d 517, 523 (6th Cir. 2007)

Hood v. Mercy Healthcare Arizona, 23 F. Supp. 2d 1125 (D.C. Ariz. 1997)

Jackson v. Baxter International, Inc., 2007 U.S. Dist. LEXIS 92722 (N.D. Ohio 2007)

Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003)

Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014)

McDonnell Douglas Corp v. Green, 411 U.S. 792, 36, L.Ed.2d 668, 93 S. Ct. 1817 (1973)

Shafir v. Continuum Health Care Partners, Inc., 2016 U.S. Dist. LEXIS 5359 (D.C. New York 2016)

White v. Columbus Metro Housing Authority, 429 F.3d 232, 239 (6th Cir. 2005)

29 C.F.R. §541.602(b)

29 C.F.R. §541.604

29 U.S.C. §213

## INTRODUCTION

Plaintiff has filed this case claiming race discrimination, retaliation and that she did not receive required overtime pay.

For the reasons set forth below, Defendant is entitled to summary judgment under Fed. R. Civ. P. 56 because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

### The Parties and Background

Defendant, Lincare Inc. ("Lincare"), is a nationwide enterprise conducting business in the health care industry. It operates over 1,000 centers in 48 states of the United States and employs over 10,000 persons.

Plaintiff, Shelly Allen ("Allen"), is a registered nurse. She is African American. Allen applied for employment at one of Lincare's operations in Livonia, Michigan in June of 2014. She was hired as an Infusion Nurse and became an "at-will" employee for Lincare. After what can best be described as a "checkered" employment history at Lincare, Allen's employment was terminated after one year in June of 2015. According to her supervisor, Allen's employment was terminated due to poor attendance, poor attitude, and inability to work with other employees, behaving disrespectfully, and being dishonest and manipulative, among other reasons. (Exhibit 20).

Allen interviewed with the center manager, Krista Hyde ("Hyde"), and the Nursing Manager, Lucille Walker ("Walker"), prior to being hired. Both acted as Allen's supervisor.

Susie Botello ("Botello") was the Lincare Area Manager of the area that included the Livonia office. Botello had some involvement in this matter.

**Allen's Employment With Lincare**

Allen was hired on June 9, 2014 as an Infusion Nurse. She was a salaried employee. Her annual salary was $70,720.00. (Exhibit 1). Her bi-weekly base salary was $2,720.00. (Exhibits 1 and 2).

The job description that was provided to and signed by Allen describes her position as "exempt". (Exhibit 3). The job description goes on to state that the position involves "full-time days" and "on-call availability to provide 24-hour service, seven days per week". (Exhibit 3). On-call time generally was scheduled on weekends and after normal business hours.

Allen received compensation in addition to her base salary when she performed on-call work[1]. Specifically, Allen was paid a stipend for each day/night she was on call regardless of whether or not it was necessary for her to see patients. The stipend was $20.00 per week day night and $50.00 for a Saturday or Sunday. In addition, while she was actually seeing patients on call, Allen was paid on an hourly basis. The hourly rate corresponded to her annual salary divided by 2,080 hours. (Exhibit 20).

The job description provided to Allen outlines the primary duties of an infusion nurse. They include coordination and communication with other health professionals, providing in-home infusion and related services to patients, assessment and instruction of patients, delivery of supplies and equipment, and related duties. (Exhibit 3).

Lincare policy requires all new hires to work through a 90-day probationary period or trial period that last 90 days (the "Trial Period"). (Exhibit 4). Every 30 days during the Trial Period, the employee is evaluated by her supervisor and the employee submits a self-evaluation. The purpose of the Trial Period is to enable Lincare to determine whether the new employee can do the work

---

[1]On-call duties were rotated among all infusion nurses pursuant to a system whereby they selected the days they would be on call. It operated fairly for all inasmuch as they rotated the order by which they would select their on-call dates.

satisfactorily and is compatible with others in the work force. (Exhibit 4, p. i). An employee can be terminated without any recourse during the Trial Period. (Id).

Allen actually performed well during her Trial Period – although a decline in the quality of her performance became evident toward the end of the Trial Period. Her manager's evaluation began with all excellent marks and ended with a combination of marks that were excellent and good. (Exhibit 5). Allen's self-evaluation grades similarly deteriorated. (Exhibit 6). They began at excellent and ended with combinations of good and fair. Id.

Soon after her Trial Period ended, Allen's performance changed and deteriorated dramatically. As discussed below, this deterioration manifested itself in several areas including her attendance, her attitude toward co-workers and superiors, her veracity and her basic willingness to perform in a satisfactory way.

**Attendance Policy At The Livonia Office**

The attendance policy at the Livonia office of Lincare while Allen was employed there was straightforward. An employee was expected to work on scheduled work days unless the employee was on vacation or had paid sick time available. (Exhibit 20). Sick time was not available until the employee completed one year of eligible service. (Exhibit 20 and Exhibit 4, p. 4). Vacation time began to accrue after six months. (Exhibit 4, p. 6).

**Allen's Attendance**

Throughout most of her Trial Period, Allen's attendance was excellent. She was absent only once toward the end of her Trial Period when she called in claiming she was unable to work due to a car issue. This occurred on August 6, 2014 -- about a month before her Trial Period ended. (Exhibit 7).

3

Two days before the Trial Period expired, Allen claimed that she suffered an injury to her wrist while handling of some medical equipment. She was placed on a work restriction -- that involved office work only -- for nearly one month from September 4 to September 30. (Exhibit 8). While on this work restriction, Allen missed work on the following seven days in September: 5, 17, 23, 24, 25, 26, and 29. (Exhibit 9).

October was not significantly better. Allen missed work on October 3 and October 20, 2014 (when she phoned and said she was "feeling down" and did not wish to work). (Exhibits 9 and 10). She refused an on-call assignment on October 23, 2014, was late for an on-call assignment on October 28, 2014 and was late for work on October 29, 2014. (Exhibit 7).

On October 31, 2014, Allen received her first disciplinary action -- a verbal warning for excessive absenteeism. (Exhibit 11). By that time, she had missed 9 days in the eight weeks following her Trial Period.

Attendance problems continued. On November 21, 2014, Allen called in claiming that her (16-year old) daughter was ill. Nonetheless, Allen appeared at the offices of Lincare on that day and complained to her center manager about scheduling and travel issues.[2] However, she refused to do any work on that day. (Exhibit 12). The following week, Allen reported late for a scheduled work assignment and only came to the office after she was called by her Manager, Walker, and told to appear. (Exhibit 7).

Allen was given another verbal warning -- this time a "Documented Verbal Warning" -- concerning attendance and other matters on December 1, 2014. (Exhibit 13).

The next several months saw more of the same. Allen failed to see all of the patients assigned to her on December 3, 2014 and did not report it to the office per proper protocol. (Exhibit

---

[2]As explained below, scheduling and travel complaints became common for Allen – almost a daily occurrence. (Exhibit 7).

14).  She also called in sick and refused to perform on-call duties on December 5, 2014.  The following day, December 29, 2014, Allen refused to work.  She walked out of the office in the morning feigning illness after being reprimanded by her supervisor. (Exhibit 16).  She also refused to perform her on-call duties that night. (Exhibit 16).

Allen called in sick January 19 and 20, 2015. (Exhibit 7). On the 28th of January, she did not perform on-call duties because she claimed she had no car. (Exhibit 17).  Allen called in on February 5, 2015 claiming she had no car available and was absent again February 17 and 18, 2015.[3]

On February 20, 2015, Allen was given a Final Written Warning that had been prepared on February 16, 2015.  Since Allen only remained at work for a very short time on February 17th and did not work on February 18th, delivery of the Final Written Warning was delayed. In fact, by missing those two days, Allen actually violated the terms of the Final Written Warning.  Among other issues, the Final Written Warning referenced "absenteeism" that has "become excessive". (Exhibit 18).

Shortly after being issued her Final Written Warning, Allen continued to miss work.  She called in on Monday, April 6, 2015 (after the Good Friday holiday) and again on June 8, 2015. (Exhibit 9).  She also refused to respond to her on-call duties on April 7, 2015. (Exhibit 19).

All-in-all, and notwithstanding that she had accrued no sick time under Lincare's policy, Allen missed a total of 20 work days (in addition to some holiday time and three vacation days she had accumulated). (Exhibit 2).  Incredibly, she missed 19 days in the 9 months she worked after her Trial Period ended – more than one missed day every two weeks.  She also reported late for work on several occasions, refused to perform her on-call duties and was unavailable during some of her on-call time.

---

[3]On February 17, 2015 Allen reported for work, looked at her schedule and left after refusing to work and claiming a "family emergency". (Exhibit 9).  She also claimed a "family emergency" as her excuse for not working on February 18, 2015. (Id).

**Allen's Poor Attitude, Liability to Work With Others, Disrespect, Dishonesty, etc.**

While on the "office only" work restriction during September of 2014, Allen was tasked with helping to create a map that plotted patient locations. The map would be utilized as a scheduling tool to assist in patient assignments. Even though Lincare was attempting to accommodate her and keep her on the payroll by finding this and other tasks she could perform in the office[4], Allen complained bitterly about having to perform such tasks. (Exhibit 20).

In October, Allen began flaunting a notebook where she began to keep track of the assignments given to "white nurses" versus the assignments given to her or others. (Exhibit 21). Obviously, such materials had a detrimental effect on the morale of the office[5].

Allen was also frequently disrespectful to her co-workers and supervisors. On one occasion, Charlene Thomas, a co-worker, reported that Allen was "bullying" her and their supervisor, Walker. (Exhibit 23). On another occasion, Allen refused a work assignment saying "I'm not fucking doing it". (Exhibit 24). Allen walked out on meetings with her supervisor and went home refusing to work. (Exhibit 16).

In February of 2015, after getting into an argument with a co-worker, Allen phoned her supervisor, Walker, on a Sunday afternoon and proceeded to berate her with a raised voice. (Exhibit 7). Allen's manager, Walker, summarized some of her dealings with Allen as follows (Exhibit 7):

> "The lack of team attitude, poor work ethic and generally complaining about the schedule almost every day is not worth the effort of keeping her at [Lincare]. As a manager, I would rather work without her than have to deal with her any longer".

---

[4]After all, she was hired to travel and work in patient's homes.

[5]Interestingly, Allen has refused to produce this notebook -- that she describes as something she kept to keep track of the things that happened to her that were "racially motivated" --in discovery. She claims she lost it. (Exhibit 22, p. 154). If this case continues after this motion, this issue will be raised in the context of spoliation of evidence sanctions. See Adkins v. Wolever, 554 F.3d 650 (6th Cir. 2009).

On several occasions, Allen improperly advised Lincare's scheduler that she needed to change the schedule and send other nurses to patients that had been assigned to her. (Exhibit 20). For example, in November of 2014, Allen advised the scheduler that she was already out there [i.e. in the downriver area] on Monday so the scheduler should "send someone else on Fridays". (Exhibit 25).

Allen also repeatedly complained about the schedule[6]. On December 29, 2014, a patient normally assigned to Allen was being reassigned to another nurse (who was on a driving restriction) to maximize efficiency. While this was being explained to Allen, by her supervisor, Walker, Allen proceeded to stand up and began to leave the room. (Exhibit 16). After she was told it was rude to walk out while her supervisor was addressing her, Allen left the office and said she was going home because she was not feeling well. She also refused her on call that night. (Id).

Allen was also dishonest and manipulative. She called in sick on occasions when she was not sick, claimed she could not work and needed to care for her daughter when that was not the case, said she had a car available for on-call work when she did not and claimed she could not work because she had no car when she did have access to one. (Exhibit 20).

In short, Allen was "disrespectful, threatening and manipulative". (Exhibit 29). She was also "infectious" in her department. (Id).

---

[6]These and similar complaints prompted Hyde to do an in-depth analysis of nursing assignments, travel and patients seen over a three-month period (the "Nursing Study"). The Nursing Study (Exhibit 26) show that the assignments were fair to all – including Allen. Even Allen seems to concede this. (Exhibit 22, p. 82).

7

## Allen's Complaints of Discrimination

In mid-October of 2014, Allen voiced a complaint of race discrimination to her Area Manager, Susie Botello[7]. There were two aspects to the complaint. The first involved an isolated comment made by Walker. Apparently, Allen was working in the office one afternoon with a surgical mask on[8]. (Exhibit 7). Her immediate supervisor, Walker, was introducing a new employee to others including Allen. Walker, as a joke, made some reference to the effect that Allen had Ebola — or was the "Ebola" nurse -- because of the mask. (Exhibits 7 and 30). Allen claims she was offended and that she believed that the remark was racially motivated[9].

The other complaint involved patient assignments. Allen complained that the "white girls" were being assigned patients who received long treatments allowing the nurse to spend more time at the patient's home. Allen claimed that she received fewer such assignments and this resulted in her working harder and seeing more patients than the "white" nurses. (Exhibit 30 and Exhibit 31).

After Allen voiced these concerns to Botello, Botello immediately brought them to the attention of Lincare's Human Resources Department ("HR"). HR contacted Allen on several occasions asking Allen to prepare a written statement outlining her position. Rather than pursue any complaint, Allen withdrew her complaint as follows (Exhibit 30):

> "When I spoke with Susie I told her I thought I may have been discriminated against. I felt that I was not being assigned any of the treatment patients and that they were only being given to the other nurses who white. I just happened to be the only AA nurse. I think this was more work discrimination and not race. I have spoken to Krista and Lucy and have since been assigned these patients after the lost of many nurses. ***I really don't feel this needs to be handled as race and I don't want to***

---

[7]Allen has a habit or practice of making complaints of racial discrimination. She sued a previous employer claiming that she was discriminated on the basis of race. That case was summarily dismissed by Judge Edmonds in February of 2010. (Exhibit 27). Allen also sued Winkelman's and the City of Dearborn claiming racial discrimination. (Exhibit 28 and Exhibit 22, p. 34-35).

[8]Allen thought another employee had a cold and she wore the mask to be sure she did not "catch" it.

[9]Allen and Walker met privately shortly after the incident and were able to resolve their differences concerning it. They actually "hugged" and "made up". (Exhibit 22, p. 126-127).

*pursue this in that manner.  There was a comment made to me by my nursing manager when introducing me to a new employee which I took as an insult but later she informed me she was just joking.  I did not take it as a joke at the time. Since, we have spoken on a more private level and this has been resolved.  I decline to move forward at this time.*  I think there was a lot of misunderstanding which I hope we have resolved can move forward without HR intervention".

Thank you for your time.

Shelly Allen.

## Allen's Termination

Allen was terminated from employment with Lincare on June 9, 2015.  Prior to termination, Allen had received a Verbal Warning on October 31, 2014 (Exhibit 32), a Documented Verbal Warning on December 1, 2014 (Exhibit 13) and a Final Written Warning on February 20, 2015 (Exhibit 18).  The Documented Verbal Warning -- which focused upon attendance and other issues - - contained the following warning:

> *"This documented verbal warning is being issued to formally advise you that if you do not demonstrate immediate and sustained improvement in your dedication and commitment to the duties and responsibilities of your job as an IV nurse, further corrective action, up to and including employment termination, will occur."*

Similarly, the final written warning dated February 16, 2015 but delivered to Allen on February 20, 2015, contained the following language (Exhibit 18):

> *You are not demonstrating the dedication and commitment level expected of someone in the position of a Nurse and an employee of Complete Infusion/Lincare.*
>
> *Your behavior lacks the commitment to be a team player which has been addressed with you in the past when we have been short staffed and there have been some scheduling changes and you have not been receptive to assist with patients.*
>
> *Yesterday you were on call and told us you did not have a vehicle to service a patient in their home if needed until after a certain time, this is unacceptable and counterproductive to the goals and objectives of our office and the violation of the following Major Infractions:*

*#9 - Engaging in behavior designed to create discord and lack of harmony, or willfully restricting work output.*

*#16 - Substandard workmanship, negligence, or inefficiency during the performance of one's duties.*

Complete Infusion Services is a 24 hour a day, 7 day a week operation dedicated to improving the functional ability and quality of life of patients in the home. Our commitment to service excellence ensures the quality of care expected by patients, and physicians. As a Nurse your first priority is to meet the needs of the patients to the best of your ability, within the policies and guidelines of the company. You arc expected to act as a team player. It is up to the members of management to assign the staff's schedule and workload to ensure the patient's needs are being met. You are not in a position to question or argue an assignment. When you are on call you must be available for and respond to all calls from the answering service within 15 minutes and, if a visit to the patient's home is required, that is to be completed within 2 hours of receiving the call. Being only available by phone is unacceptable.

***Also in your Documented Verbal Warning given to you on December 1, 2014 it was address with you that your absenteeism has begun to become excessive. Since that time you have missed another two (3) days (1/17 and 1/18, 2/5/15).*** Though there was a legitimate reason for the absence 1/17 and 1/18 it affects you dependability and the daily operation of the office.

***This final written warning is being issued to formally advise you that if you do not demonstrate immediate and sustained improvement in your behavior by demonstrating the dedication and commitment to the duties and responsibilities of your job as an IV Nurse, further corrective action, up to and including employment termination, will occur.***

After her Final Written Warning was prepared, Allen had additional absences and failed to properly address on-call duties on several occasions. In fact, she missed work on February 17, 18, April 6 and June 8. Allen was terminated from employment on June 9, 2015.

As noted above, Allen was absent from work 19 times in the 9 months following her Trial Period. Importantly, she had no sick time as sick time was accrued only after an employee worked for a full year. (Exhibit 4). Allen did not work over one year. Effectively, all of her time off during those 19 days was unauthorized. (Exhibit 20).

**Allen's EEOC Complaints**

Allen filed an EEOC Complaint on December 29, 2014. (Exhibit 33). The EEOC declined prosecution and issued a "right to sue" letter on June 9, 2015[10]. (Exhibit 34). Allen did not pursue that matter.

Allen filed a second EEOC Complaint on July 15, 2015 challenging her termination. (Exhibit 35). Again, the EEOC declined prosecution and issued a right to sue letter on April 19, 2016. (Exhibit 36).

Allen responded by filing this case.

## ARGUMENT

## I.    THE STANDARD FOR SUMMARY JUDGMENT

Although undoubtedly well known to the Court, a brief word on the standard for summary judgment is proper.

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 32. 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party can discharge this burden in two ways: by producing evidence to indicate there is no genuine issue of material fact, or by demonstrating that the nonmoving party fails to show sufficient evidence to establish the existence of an element essential to that party's case. Id.

If the moving party has met its burden, the nonmoving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts

---

[10]Ironically, this is the same day Allen was terminated. Of course, however, Lincare did not know of the EEOC's action at that time.

showing that there is a genuine issue for trial." Moldowan v. City of Warren, 578 F.3d 351, 374 (6th Cir. 2009) Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). The existence of a mere scintilla of evidence in support of the nonmoving party's position will not defeat a motion for summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 1505, 91 L.Ed.2d 202 (1986). There must be evidence on which a jury could reasonably find for the nonmoving party. Id.

When reviewing summary judgment motions, a court must view the evidence, and the reasonable inferences that can be drawn from it, in a light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587. Cases proceed to trial, even if a party's evidence is inconsistent, because in reviewing a motion for summary judgment, weighing the evidence and making credibility determinations are prohibited. Amerson v. Waterford Twp., 562 Fed. Appx. 484, 488 (6th Cir. 2014) (quoting Coble v. City of White House, Tenn., 634 F.3d 865, 870 (6th Cir. 2011)). Even so, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007). However, "[t]he blatantly contradictory standard is a difficult one to meet and requires opposing evidence that is largely irrefutable." Amerson, 562 Fed. Appx. at 489. "Facts that are not blatantly contradicted by [evidence such as a video] recording remain entitled to an interpretation most favorable to the non-moving party." Coble, 634 F.3d at 870.[11]

As appears below, there is no genuine issue as to any material fact on the present record. Lincare is entitled to summary judgment dismissing Allen's Complaint.

---

[11]See also Dixon v. Neubacher, 2015 U.S. Dist. LEXIS 41691 (ND Ohio, 2015). Copies of unreported cases are attached at Exhibit 4I.

**II.**     **LINCARE IS ENTITLED TO SUMMARY JUDGMENT ON ALLEN'S CLAIMS OF RACE DISCRIMINATION.**

A fair reading of Allen's Complaint suggests that she claims that she was discriminated against in violation of 42 U.S.C. §2000e-2(a)(1) ("Title VII") and/or Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et. seq.

As this Court is undoubtedly aware, claims of race discrimination brought pursuant to Michigan's ELCRA are analyzed under the same evidentiary framework as similar claims brought under Title VII. Jackson v. Quantex Corp., 191 F.3d 647, 658 (6th Cir. 1999). In a Title VII action, a Plaintiff may establish discrimination either by introducing direct evidence of discrimination or by providing inferential and circumstantial evidence which would support an inference of discrimination. DiCarlo v. Potter, 358 F.3d 408 (6th Cir. 2004).

Under the direct evidence approach, the Plaintiff must first introduce direct evidence that the employer terminated her because of her race. If the Plaintiff comes forward with such evidence, the burden of persuasion shifts to the employer to prove that it would have terminated the Plaintiff even had it not been motivated by discrimination. Manzer v. Diamond Shamrock Chemicals Company, 29 F.3d 1078, 1081 (6th Cir. 1994).

In contrast, under the circumstantial evidence approach, "the familiar McDonnnell Douglas -- Burdine tripartite test is employed". Johnson v. University of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000)[12].

As appears below, Allen's claims of discrimination fail under either approach.

---

[12]This test is based upon McDonnell Douglas Corp v. Green, 411 U.S. 792, 36, L.Ed.2d 668, 93 S. Ct. 1817 (1973) as modified by Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L.Ed.2d 207, 101 S. Ct. 1089 (1981) and is discussed in §II B below. (Id).

### A.    **There Is No Direct Evidence Of Race Discrimination.**

Allen may attempt to argue that she possesses direct evidence of discriminatory animus by Lincare.  In this context, direct evidence refers to evidence "that proves the existence of a fact without requiring any inferences".  Blair v. Henry Filters, Inc., 505 F.3d 517, 523 (6th Cir. 2007).

Allen may claim that the following comments/actions of her immediate supervisors, Walker and Hyde, are direct evidence that her termination was motivated by racial discrimination:  (1) Walker's reference to Allen as the "Ebola" nurse; (2) Walker's statement to Allen that Allen "shouldn't touch her"; (3) Walker's supposed acknowledgement that Allen was sent to every "far" patient "on purpose"; (4) Hyde was "nasty" to Allen all the time and any time she had something to say "it was never nice" and/or (5) Allen was told to kneel during a meeting with her supervisor. (Exhibit 22, p. 125-135)[13].

None of these comments constitute direct evidence of race discrimination as required by Blair v. Henry Filters, Inc., 505 F.3d 517, 523 (6th Cir. 2007).  Each comment is ambiguous and inoffensive when viewed without the assistance of any inferences.  Indeed, these comments/actions, even if believed, do not require or even suggest the conclusion that unlawful discrimination was a motivating factor in Lincare's actions[14].  Accordingly, the evidence does not suffice to establish a claim of race discrimination using direct evidence.  See White v. Columbus Metro Housing Authority, 429 F.3d 232, 239 (6th Cir. 2005).

Moreover, all of the above comments/actions were made at a time remote from Allen's termination from employment in June of 2015.  As such, they fail to constitute direct proof of

---

[13] Most of these claims are disputed – but not for purposes of this Motion.

[14] In fact, a host of cases support the proposition that isolated incidents and/or isolated comments that appear to involve discriminatory animus do not amount to discriminatory changes to the terms and conditions of employment and therefore are not actionable.  Graves v. Dayton Gastroenterology, Inc., 657 Fed. Appx. 485 (6th Cir. 2016); Johnson v Donahoe, 642 Fed. Appx. 599 (6th Cir. 2016).

discrimination because "the critical inquiry . . . is whether [race] was a factor in the employment decision at the moment it was made." Id. In this case, Allen simply presents no evidence linking the challenged comments/actions to the time she was discharged from employment.

Even if Allen had some direct evidence of discrimination -- and she has none -- her termination was proper and she would have been terminated even if the action was not motivated by race. Allen's attendance and behavior speak for themselves. Missing more than a full day of work every other week, behaving disrespectfully and refusing and avoiding on-call duties all justify termination. A 24/7 medical operation like Lincare's Livonia office cannot tolerate an employee who is absent without authorization 19 times in 9 months as Allen was after her Trial Period. Allen violated the warnings contained in the disciplinary reports she received. Termination was proper even if it was motivated in part by discrimination -- and it was not.

**B.**      **There Is No Circumstantial Evidence Of Race Discrimination.**

Inasmuch as there is no direct evidence of discriminatory intent in this case, Allen's claim can survive summary judgment only if she can establish her case with circumstantial evidence under the framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d. 668 (1973) as modified by Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L.Ed.2d 207, 101 S. Ct. 1089 (1981). See Johnson v. University of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000).

In order to demonstrate a prima facie case under this framework, the Plaintiff must show (1) membership in a protected class; (2) that she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly situated employees outside her protected class. Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006); Smith v. City of Salem Ohio, 378 F.3d 566, 570 (6th Cir. 2004); Johnson, 215 F.3d at 572.

If the Plaintiff satisfies this prima facie burden, the burden of production "shifts to the Defendant to articulate some legitimate, non-discriminatory reason for the challenged employment action. McDonnell Douglas, 411 U.S. at 802; Johnson, 215 F.3d at 572. In the event the Defendant carries this burden, the Plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the Defendant were not its true reasons but were a pretext for discrimination. McDonnell Douglas, U.S. at 804. The Plaintiff can refute the legitimate, non-discriminatory reason articulated by the employer and prove pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the Defendant's challenged conducted, or (3) was insufficient to warrant the challenged conduct. Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003). In other words, the Plaintiff can show pretext by proving that the Defendant did not honestly believe the proffered non-discriminatory reason for its adverse employment action. Balmer v. HCA, Inc., 423 F.3d 606 (6th Cir. 2005).

### 1.    **Allen Cannot Establish A Prima Facie Case of Discrimination Because She Cannot Sustain the Fourth Element That She Was Treated Differently**.

In this case, Allen cannot establish the fourth element of her prima facie case -- i.e. that she was treated less favorably than similarly situated white employees. Allen will attempt to do so in two ways: (i) by comparing nursing assignments she received against other nurses, and (ii) comparing her attendance to other nurses. Both attempts fail.

**Nursing Assignments**. During her deposition, Allen testified that she had no information concerning how assignments to infusion nurses were handled. In other words, she did not know how patients were assigned to specific nurses. As she states, "I don't know how they were assigned, if they were by treatment type or what". (Exhibit 22, p. 48). She continued, "I didn't assign them so how I say how they were assigned". (Exhibit 22, p. 51).

16

Not only is Allen not aware of how nurses were assigned, she can come forward with no specific evidence that she was treated differently than similarly situated employees outside her protected class as it relates to assignments. Allen cannot show that others received more favorable nursing assignments. Any "evidence" she may attempt to proffer in this regard is nothing but her own speculation or innuendo. Discovery is over and Allen has simply not produced any evidence to support her claim.

The Nursing Study prepared by Hyde (Exhibit 26) clearly demonstrates that nurse assignments were fair in terms of time and travel -- Allen's only complaints. In fact, Allen concedes that the Nursing Study Hyde completed – the only evidence in this record on the topic – actually shows that the work was assigned fairly. (Exhibit 22, p. 82)[15].

**Attendance.**  Allen is also unable to present any evidence showing that similarly situated nurses outside of the protected class were treated more favorably than her concerning attendance. In fact, there were no other nurses with an attendance record that even remotely resembled Allen's attendance record.

The only comparison Allen has attempted to draw involves an infusion nurse by the name of Luvina Snider ("Snider"). Snider, a Filipino, was hired approximately the same time as Allen. She lived with her mother who became terminally ill and died in 2015. The record shows that Snider missed 9 days of work after her Trial Period due to the situation with her mother and her own health issues. (Exhibits 20 and 37). Snider was given a Final Written Warning relating to her attendance. (Exhibit 37). Unlike Allen, Ms. Snider's attendance improved. (Exhibits 7 and 20). Indeed, there is

---

[15]Allen's only challenge to the nursing study was she did not believe it was accurate. When asked to explain, she could point to nothing except that she claimed it did not include her on-call time. In fact, all on-call time was included. (Exhibit 20). Even if it was not, the document was designed to show that nursing assignments were fairly made. On call is arbitrary because whatever comes in afterhours must be addressed. It would be virtually impossible to try to establish a system to fairly assign on-call treatments except to ensure that on call in general was fairly assigned. This was done. (Id).

no evidence that she missed additional days. Moreover, and unlike Allen, Snider was always willing to try to make up for time that she missed and Snider had none of the other employment issues that were experienced with Allen. (Exhibit 7).

Allen, on the other hand, missed a total of 19 days after her Trial Period ended. She was absent 7 days in September of 2014. She missed another two days in October, and six more from November through February. She also walked out of the office on December 29, 2014 without doing any work. Allen was given a Final Written Warning after missing 18 days -- twice as many as Ms. Snider -- and after exhibiting a broad range of other employment issues.

After her Final Written Warning, Allen missed additional days in April and June and neglected on-call duties. Only then was she terminated. Overall, Allen missed over twice as much time as did Ms. Snider. She also refused on-call time, disregarded on-call time and reported late for both work and on-call duties.

Finally, Snider was truly a "team player" who assisted her co-employees and supervisors. She was not disruptive, dishonest or manipulative as was Allen.

In short, Allen's attempt to argue that Snider was a "similarly situated" employee is flatly wrong. There are no similarities. Allen has no circumstantial evidence to support the fourth element of a prima facie case of discrimination – i.e., that similarly situated persons outside of the protected class were treated more favorably. She cannot establish a prima facie case of race discrimination. Lincare is entitled to summary judgment.

### 2.    **Allen Cannot Show Pretext**.

Even if Allen could demonstrate a prima facie case -- and she cannot -- Lincare has articulated a legitimate non-discriminatory reason for its decision to terminate Allen's employment. Allen did not improve her performance in accordance with the Final Written Warning prepared on

February 16, 2015 (delivered to her on February 20, 2015). Rather, she continued to miss work. She literally walked out on February 17, 2015 after receiving her schedule. She claimed some unspecified "family emergency" and refused to work. She also refused to report to work the next day. Thereafter, she called in on April 6, 2015 and again on June 8, 2015 after failing to properly respond to on-call duties on April 7 and 12.

None of these facts are open to question or dispute. These facts are true. These facts motivated the decision to terminate Allen and termination was warranted. See Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003) and Exhibit 20. Allen simply cannot show that her termination was a pretext for discrimination. In addition, even Allen concedes that refusing on call is reason enough for termination. (Exhibit 22, p. 140). Shortly after her final warning, she not only put her on-call calls on hold for hours, she also failed to respond to calls. (Exhibit 20).

Lincare's action was no pretext. It was honestly based upon Allen's behavior. Allen's behavior justified the action. There was no pretext for discrimination. Balmer v. HCA, Inc., 423 F.3d 606 (6th Cir. 2005); Johnson v. Kroger Co., 319 F.3d 858 (6th Cir. 2003).

## III.    LINCARE IS ENTITLED TO SUMMARY JUDGMENT ON ALLEN'S CLAIMS FOR RETALIATION.

### A.    Allen Cannot Establish A Prima Facia Case of Retaliation.

Title VII prohibits an employer from retaliating against an employee who has filed a charge under Title VII. 42 USC §2000e-3(a). The standard a plaintiff must meet to establish a prima facie case of retaliation is well settled in this Circuit. According to Laster v. City of Kalamazoo, 746 F.3d 714, 730-731 (16th Cir. 2014):

> To establish a *prima facie* case of retaliation under Title VII, Plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal

connection existed between the protected activity and the materially adverse action. (Citations omitted).

Importantly, Title VII retaliation claims "must be proved according to traditional principles of but-for causation" which "require proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer". Laster, 746 F.3d at 731 citing University of Texas Southwestern Medical Center v. Nassar, ___ U.S. ___, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013).

Allen is unable to establish a prima facie case of discrimination because she is unable to come forward with any admissible evidence that there is a "but-for" causal link between her alleged protected activity and her termination from employment. In other words, Allen cannot satisfy the fourth element – a "but-for" causal connection – as a matter of law.

Generally speaking, temporal proximity by itself is insufficient to establish causation, the fourth element of a prima facie case of retaliation under Title VII. Randolph v. Ohio Department of Youth Services, 453 F.3d 724, 737 (6th Cir. 2006). Indeed, the Sixth Circuit has only found temporal proximity to satisfy the causal connection element of a prima facia case of retaliation where the temporal proximity was "very close". See Jackson v. Baxter International, Inc., 2007 U.S. Dist. LEXIS 92722 (N.D. Ohio 2007). As stated in Jackson:

> "Furthermore, the Sixth Circuit has repeatedly found the causal connection element satisfied when the temporal proximity of the adverse employment action coupled with other indicia of retaliation was within months or less of the protected activity. See, e.g., Randolph [v. Ohio Department of Youth Services, 453 F.3d 724, 737 (6th Cir. 2006)] (holding causation was established where plaintiff was placed on leave the **same month** she complained about workplace sexual assaults and was terminated six months later); Singfield v Akron Metro. Hous. Huth., 389 F.3d 555, 563 (6th Cir. 2004) (**three months** sufficient); DiCarlo v. Potter, 358 F.3d 408, 421-22 (6th Cir. 2004) (**three weeks** sufficient). *However, the Sixth Circuit has consistently determined temporal proximity beyond three months, absent some further indicia of retaliation was insufficient to infer causation.* Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999) (two to five months insufficient); Cooper

v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986) (four months was insufficient to support an inference of retaliation).

The United States Supreme Court in Clark County School District v. Breeden, 532 U.S. 268, 274, 149 L.Ed.2d 509, 121 S. Ct. 1508 (2001), has reiterated that:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close', Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). See e.g., Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (four-month period insufficient)."

Lincare's research of Sixth Circuit precedent has failed to reveal any authority that suggests that temporal proximity exceeding three months is alone sufficient to establish a prima facia case of causal connection required by a retaliation claim. See Frazier v. Richland Pub. Health, 2017 U.S. App. LEXIS 6081; 685 Fed. Appx. 443 (6th Cir. 2017)[16].

In this case, Allen alleges that the protected activity occurred on December 29, 2014 when she filed her Complaint with the EEOC -- nearly six months before she was terminated on June 9, 2015. Pursuant to controlling Sixth Circuit authority, the temporal proximity between the protected activity and the adverse employment action – nearly six months – is simply insufficient standing alone to establish the causation requirement of a prima facia case of retaliation. Accordingly, Plaintiff can only establish a prima facia case of causation by coupling the temporal connection with other indicia of retaliatory conduct. See Randolph v. Ohio Department of Youth Services, 453 F.3d 724, 737 (6th Cir. 2006); Jackson v. Baxter International, Inc., 2007 U.S. Dist. LEXIS 92722 (N.D. Ohio 2007); Kuivila v. City of Newton Falls, 2016 U.S. Dist. LEXIS 17041 (N.D. Ohio 2016) (where some time elapses between the protected activity and the subsequent adverse employment

---

[16]Frazier cites Seeger v. Cincinnati Bell Telephone Company, 681 F.3d 274, 283-84 (6th Cir. 2012) where temporal proximity of two months was found sufficient, Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) where the retaliation allegedly occurred the same day as the protected activity. The court also cited cases where temporal proximity of two months and three months were deemed sufficient.

action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality, citing <u>Mickey</u> v. <u>Zeidler Tool & Die Co.</u>, 516 F.3d 516, 525 (6th Cir. 2008)).

Allen is unable to offer any other evidence of retaliatory conduct that would be necessary to establish causality. This is fatal to her claim. When pressed at deposition, she referred to the "false dates" in her "fake write ups" that led to her being fired. (Exhibit 22, p. 190). However, Allen's reference to "false dates" is nothing but an attempt to bamboozle the Court. Admittedly, the Documented Verbal Warning given to Allen on December 1, 2014, did contain a typographical error concerning the date. It suggests that she was absent on September 11, 2014 when she was actually absent – and Allen acknowledges that she was actually absent – on September 17, 2014. (Exhibit 38). In addition, Allen's Final Written Warning incorrectly states that she missed work January 17 and January 18 of 2015 when the actual dates were January 19 and January 20. Again, those were mistakes and Allen admits that she did not attend work on January 19 and January 20 of 2015.[17]

In any event, Allen's suggestion that the "false dates" in her disciplinary write ups constitute indicia of retaliation is not only wrong, it is disingenuous. It is also disingenuous for her to suggest that her write ups were "fake". In fact, the write ups are factually accurate and true. They also provide a proper basis for termination[18].

Finally, Allen may suggest that events that preceded her December 29, 2014 EEOC Complaint may constitute additional evidence of retaliatory conduct because she made a prior complaint of discrimination in October of 2014 to Lincare management. Any such argument, however, completely misses the mark. In fact, Allen did not make a prior claim of discrimination. Rather she consciously elected not to make a claim of retaliation in October of 2014. She

---

[17]The final written warning was corrected and the correct dates were inserted. (Exhibits 18 and 39).

[18]It is also important to recall that Allen was an "at-will" employee. Lincare did not need just cause to terminate her employment.

22

specifically informed HR that she was electing *not* to proceed with any complaint.  It is simply absurd to suggest that Lincare somehow retaliated against Allen because she did *not* to file a complaint with HR.

**B.      Allen Cannot Establish Pretext.**

Even if Allen could create a prima facie case of retaliation – and she cannot – her retaliation claim must still fail.  As noted in Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) a plaintiff's retaliation claim is tested under the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973).  Under McDonnell Douglas, plaintiff bears the initial burden to establish a prima facie case of retaliation.  If the plaintiff succeeds, the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions.  If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that defendant's proffered reason is not the true reason for the employment decision; it is a pretext.  Laster, supra.  Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process.  Id.

In order to demonstrate that a stated reason was merely a pretext for retaliation, the plaintiff must submit evidence that the proffered reason (i) had no basis in fact, (2) did not motivate the challenged conduct, or (3) is insufficient to warrant the challenged conduct.  Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003).  In short, the employee must show that the employer did not honestly believe the proffered non-discriminatory reason for its adverse employment action.  Balmer v. HCA, Inc., 423 F.3d 606, 614 (6th Cir. 2005); Harman v. Dow Chemical Co., 657 Fed. Appx. 448 (6th Cir. 2016); McNeely v. Kroger, 2014 U.S. Dist. LEXIS 97262 (E.D. Mich. 2014).

In this case, Lincare terminated the employment of Allen for a number of reasons – including her demonstrated poor attendance. Allen missed 19 days of work without authorization during the 9 months after her Trial Period. She frequently refused or failed to carry out her on-call duties, was late and/or inattentive to her responsibilities. In addition, and unlike other employees, Allen refused to make up her time. She also exhibited an extremely poor attitude that seriously undermined the morale at Lincare and acted disrespectfully to her supervisors.

In short, there is absolutely no basis or evidence to support any suggestion that the reasons assigned to Allen's termination were a pretext and that Lincare actually desired to terminate her because she had filed an EEOC Complaint.

Lincare is entitled to summary judgment.

## IV.    LINCARE IS ENTITLED TO SUMMARY JUDGMENT ON ALLEN'S CLAIMS FOR OVERTIME PAY AS ALLEN WAS AN EXEMPT, PROFESSIONAL EMPLOYEE.

Count II of Allen's Complaint alleges that Lincare failed to pay overtime to Allen in violation of the Fair Labor Standards Act ("FLSA") 29 U.S. §201, et seq. and/or the Michigan Minimum Wage Act of 1964 ("MWA"), as amended, MCL 408.381, et seq.[19] As appears below, however, Allen was an exempt, professional employee who was not entitled to overtime.

The FLSA requires that most employees in the United States be paid at least the federal minimum wage for all hours worked and overtime pay at time and one-half the regular rate of pay for all hours worked over 40 in a work week. (Exhibit 40). However, Section 13(a)(1) of the FLSA provides an exemption for employees employed as bonafide professional employees. Id.; 29 U.S.C. §213. Under this exemption, overtime pay is not required if two conditions are not met. Specifically, overtime pay is not required (i) if the employment position satisfies the "duties test",

---

[19]The Michigan Minimum Wage Act of 1964 was repealed in 2014 by Public Acts 2014, No. 138 that was effective May 27, 2014. It was replaced by the Michigan Workforce Opportunity Wage Act, MCL 408.411, et seq., that is effectively identical to the FLSA for present purposes. See MCL 408.414a(4). Accordingly, only the FLSA will be discussed.

and (ii) the employee is paid as a salaried employee. Hood v. Mercy Healthcare Arizona, 23 F. Supp. 2d 1125 (D.C. Ariz. 1997).

Both conditions are satisfied in this case. Allen is an exempt employee. Allen is not entitled to overtime pay as a matter of law.

### A.    The Duties Test.

Learned professionals meet the "duties test" under 29 U.S.C. §213(a)(1). This includes registered nurses that are paid on a salary basis of at least $913.00 per week. 29 C.F.R. §541.301; 29 C.F.R. §541.604. (See also Exhibit 40, Fact Sheet No. 17n).

The regulations promulgated under FLSA are clear and provide that "registered nurses who are registered by the appropriate State Examining Board generally meet the duties requirement for the learned professional exemption". 29 C.F.R. §541.301(e)(2). The federal courts have followed this rule and determined that licensed, registered nurses, like Allen, are exempt, professional employees. Richardson v. Genesee County Community Mental Health Services, 45 F.Supp. 2d 610, 615 (1999); Hood v. Mercy Healthcare Arizona, 23 F.Supp. 2d 1125, 1128 (D.C. Ariz. 1997).

Allen satisfies the "duties test". She is a licensed nurse and performed in that capacity at Lincare.

### B.    The Salary Based Test.

Once it is determined that an employee is an exempt professional employee – and thereby meets the "duties test" -- overtime pay is not required provided the "salary based test" is also met. See Hood v. Mercy Healthcare Arizona, 29 F. Supp. 2d 1125, 1128 (D.C. Ariz. 1997). The issue posed by the "salaried based test" is whether the employee is paid on a salary basis or an hourly basis. District of Columbia Nurses' Association v. District of Columbia, 1998 U.S. Dist. LEXIS 16500 (D.C. D.C. 1998).

In this case, Allen was paid on a salary basis and satisfied the "salary based test". Allen was hired on a salaried basis. (Exhibit "1"). Her job description provides that her position is "exempt" and her earning statements show that she regularly received wages exceeding $913.00 per week. (Exhibits 2 and 3).

Moreover, the regulations passed pursuant to the FLSA address the only two possible arguments that Allen may make in support of her position that she was paid on an hourly basis.

First, 29 C.F.R. §541.604 provides as follows:

"the exemption is not lost if an exempt employee who is guaranteed at least $913.00 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal work week. Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis), and may include paid time off."

Second, 29 C.F.R. §541.602(b) provides that deductions may be made from an exempt employee's pay (i) when the employee "is absent from work for one or more full days for personal reasons, other than sickness or disability", and (ii) for absences for one or more full days occasioned by sickness or disability if the deduction is made in accordance with a bonafide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability. In cases involving sickness or disability, the employer is not required to pay any portion of the employee's salary for full day absences for which the employee receives compensation under the plan, policy or practice; and, deductions for full day absences may also be made before the employee is qualified under the plan, policy or practice, and after the employee has exhausted the leave allowance thereunder.

In this case, Allen was paid a bi-weekly salary of $2,720.00 or a weekly salary of $1,360.00. Allen also received "on call" pay pursuant to Lincare policy for work beyond the normal work week – i.e., beyond her normal 40 hours. In that respect, Allen was paid a per diem amount ($20.00 for

weekday nights on call and $50.00 for weekend on call) plus additional pay on an hourly basis for on-call visits she actually made. This program is entirely consistent with 29 C.F.R. §541.602(b)(1).

Allen was also subject to full day deductions when she missed work for personal reasons other than sickness or disability. This entirely consistent with 29 C.F.R. §541.602(b). In addition, Lincare had a specific policy for sick leave and disability. (Exhibit 4). Allen received one-day deductions when she missed work because she was sick and did not qualify for sick pay pursuant to Lincare policy. These deductions are also entirely consistent with 29 C.F.R. §541.602(b). See Shafir v. Continuum Health Care Partners, Inc., 2016 U.S. Dist. LEXIS 5359 (D.C. New York 2016).

In short, Allen cannot demonstrate an entitlement to overtime pay. She was an exempt professional employee who met the "duties test" and the "salary based test". There is no genuine issue of material fact in this regard. Lincare is entitled to summary judgment on Count II of Allen's Complaint.

s/John A. Ruemenapp
Weisman, Young & Ruemenapp, P.C.
Attorney for Defendant
30100 Telegraph Road, Suite 428
Bingham Farms, MI 48025
Phone No.: (248) 258-2700
Fax No.: (248) 258-8927
jruemenapp@wyrpc.com
(P34796)

Dated: September 28, 2017

F:\CLIENTS\L\Lincare 5158-\Shelly Allen -8667\Pleadings\D's Mtn For Summary Judgment - Brief in Support.doc

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2017, I electronically filed **Defendant's Motion For Summary Judgment, Brief in Support of Defendant's Motion For Summary Judgment and Index of Exhibits** with the Clerk of the Court using the ECF system which will send notification of such filing to the following participants:

**nyatooma@normanyatooma.com**
**gfleming@normanyatooma.com**
**cconstantino@normanyatooma.com**

/s/John A. Ruemenapp
Weisman, Young & Ruemenapp, P.C.
Attorney for Defendant
30100 Telegraph Road, Suite 428
Bingham Farms, MI  48025
Phone No.:  (248) 258-2700
Fax No.:  (248) 258-8927
jruemenapp@wyrpc.com
(P34796)

Dated:  September 28, 2017

F:\CLIENTS\L\Lincare 5158-\Shelly Allen -8667\Pleadings\D's Mtn For Summary Judgment - Brief in Support.doc