UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELLY ALLEN,

        Plaintiff,

                                  CASE NO. 16-CV-11996
v.                               HON. GEORGE CARAM STEEH

LINCARE INC.,

        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Doc. 28) AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 29)**

Plaintiff Shelly Allen, a registered nurse who worked for defendant

Lincare, Inc. ("Lincare"), as a traveling infusion nurse for one year before

she was fired allegedly for excessive absenteeism, brought this race

discrimination suit under Title VII, 42 U.S.C. § 2000e-2(a)(1) and

Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§

37.2101, *et seq.* She also alleges retaliation for filing internal grievances

with her employer, and a complaint to the Equal Employment Opportunity

Commission ("EEOC"), as well as alleged violations of overtime provisions

of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Now

before the court are Lincare's motion for summary judgment, and Allen's

-1-

motion for partial summary judgment as to the overtime claim only. Oral argument was heard on December 21, 2017 and informs the court's decision here.  For the reasons set forth below, Defendant's motion for summary judgment shall be granted and Plaintiff's motion shall be denied.

## I. Background

On June 9, 2014, Lincare hired Allen to work as an infusion nurse out of its Livonia office.  Allen was the only African American nurse assigned to that office.  Allen's duties included making home calls to patients where she would provide a variety of services including drawing blood, changing dressings, providing cath care and antibiotics, and more complicated procedures such as providing immunoglobulin (IG), hydration, Remicade, enzymes, and steroids.  (Pl's. Dep. at 43-53, Doc. 33 Ex. 1)  Allen claims she was provided the more complicated procedures less often that white nurses despite her requests for the more challenging work.  *Id.* at 52-53. Center Manager Krista Hyde hired her, *id.* at 133, and Allen reported to her immediate supervisor, Lucille Walker. (Walker Dep., Doc. 28, Ex. 7 at 2, ¶ 3).

## A.   Attendance Problems

During her 90-day probationary period, Allen received exemplary marks.  (Doc. 28, Ex. 5).  However, once her probationary period ended,

Allen had a serious absentee problem.  According to Lincare's attendance policy, an employee does not accrue sick leave until she has completed one year of eligible service, and vacation time begins to accrue after six months.  After Allen's probation period ended, she was absent nineteen times, not including the holiday time and three vacation days she had accumulated, before she was terminated in June, 2015, for poor attendance, poor performance, and poor attitude. Prior to her termination, she was warned several times about her absentee problem.

First, she received a verbal warning for excessive absenteeism on October 31, 2014, arising out of her 9 missed days in the first eight weeks following her probationary period.  (Doc. 28, Ex. 11).  After calling in sick again, reporting to work but refusing to perform her duties, and arriving late for an assignment, Lincare gave Allen a documented verbal warning on December 1, 2014.  (Doc. 28, Ex. 13).  Despite the second warning, Allen's attendance problems continued and she missed several more days of work, citing the reasons as not having a car, not feeling well, and experiencing a family emergency.  (Doc. 28, Ex. 14, 16-17).  As a result, Lincare prepared a final written warning on February 16, 2015, which ironically, it could not deliver to Allen until February 20, 2015, as she left work early on February 17th and did not report to work on February 18th.

(Doc. 28, Ex. 18). Despite the final written warning, Allen missed work again in April, refused to respond to her on call duties during that same month, and again on June 8, 2015. (Doc. 28, Ex. 9, 19). As a result of these continued excessive absences, and for other reasons as well, Lincare terminated Allen on approximately June 9, 2015. (Doc. 33, Ex. 16).

Allen claims the write-ups contained erroneous information. Lincare concedes that there were some typographical errors in her disciplinary warnings. For example, the documented written warning states that Allen was absent on September 11, 2014 when in fact she was absent on September 17, 2014, and the final written warning states that Allen was absent on January 17 and 18, 2015, when in fact she was absent on January 19 and 20, 2015. But Allen does not dispute that she was absent nineteen times in the nine months she worked after her probationary period ended.

## B.   Plaintiff's Poor Attitude

Lincare began noticing a decline in Allen's attitude near the end of her probationary period when her marks began to slip. In September, 2014, Allen was assigned to office work because of a medical restriction and one of her assignments was to identify patient locations on a map. Allen complained about the assignment. (Doc. 28, Ex. 20 at 3, ¶ 7). One

of her co-workers complained to Walker that Allen was "bullying" her. (Doc. 28, Ex. 23). Lincare also alleges that on one occasion, Allen refused a work assignment saying "I'm not [expletive] doing it." (Doc. 28, Ex. 24). Allen denies this. Lincare also alleges that Allen was disrespectful of management. On another occasion, Allen walked out of meeting with her supervisors and went home claiming to be ill. (Doc. 28, Ex. 16). Allen complained about the schedule repeatedly. (Doc. 28, Ex. 20 at 3, ¶ 8). Lincare also alleges that Allen was disrespectful and dishonest, and that her excuses for missing work were not always true. For example, on one occasion she claimed to have access to a car while on call, but in fact, did not. On another occasion, she claimed she could not work because she lacked access to a car, when in fact she had one available. *Id.* at 3, ¶ 9. In addition to attendance problems, Lincare's final written warning to Allen cited her lack of access to a car while on call was a major infraction under the company's policies, and that Allen was not a good team player as she was not responsive to scheduling changes and was critical of management's decisions regarding assignments. (Doc. 28, Ex. 18).

## C.    Complaints of Racial Discrimination

In August, 2014, Allen began complaining to her supervisors, Walker and Hyde, that she was receiving less complicated assignments than other

nurses which required her to travel more and to see more patients.  (Doc.

33, Pl. Dep., Ex. 1 at 54).  Allen claims there was no change in her

assignments at that point, so in October, 2014, she complained to Area

Manager, Sue Botello, who forwarded her complaint to Human Resources

Manager, Linda Feller.  *Id.* at 56-57.  Allen claims she began to receive

more complicated assignments for a while after making her internal

complaint, including receiving IGs, but that the change was short-lived.  *Id.*

at 58.  On December 29, 2014, Allen filed a formal charge of discrimination

with the EEOC and the Michigan Department of Civil Rights alleging that

she was being denied preferential assignments because of her race.  (Doc.

33, Ex. 6).  The EEOC dismissed the complaint and issued a right to sue

notice on June 9, 2015.  (Doc. 28, Ex. 34).  Allen filed a second EEOC

complaint challenging her termination on July 15, 2015.  (Doc. 28, Ex. 35).

The EEOC declined prosecution and issued a right to sue letter on April 19,

2016.  (Doc. 28, Ex. 36).

Lincare disputes that Allen received less favorable assignments than

other nurses.   Lincare has produced nursing clinical activity logs showing

that from October, 2014, when Allen was removed from her office only

restriction, until her termination, she was assigned to see 27 IG patients, or

approximately two to five such patients per month, or an average of 3.0 IG

patients per month.  (Doc. 34, Ex. B).  During this same period, four other infusion nurses averaged 0, 2.7, 3.6, and 4 IG patients per month.  *Id.*

In addition to the allegedly discriminatory assignment of nursing duties, Allen argues that she has three other instances of direct proof of Lincare's racial bias against her.  First, and at the crux of her complaint, she relies on a comment that Walker admittedly made when she referred to her as the "ebola" nurse when introducing her to a new nurse in November, 2014.  (Doc. 33, Walker Dep., Ex. 2, 3 at 103-04).  Walker claims the comment was meant to be funny and was based on the fact that Allen was wearing a surgical mask at the time.  *Id. a*t 103.  Allen denies that she was wearing a mask at the time that the comment was made and claims it is evidence of racial bias.  (Doc. 33, Pl. Dep., Ex. 1 at 126, Ex. 2).  When Allen and Walker later discussed the comment, Allen apologized and hugged her.  (Doc. 33, Pl. Dep., Ex. 1 at 127).

Second, she relies on a comment that Walker told Allen, "don't touch me, I find that very condescending when you touch me."  *Id.* at 128.  Third, during her deposition, she testified that a co-worker Kim Van Berkel threw papers at her and cursed her, yet Walker and Hyde failed to take corrective action.  *Id.* at 130, 135.  Although Allen testified to the alleged incident at her deposition, in the argument section of her brief, she does not mention it

and Lincare has not responded to the claim.  Fourth, Allen claims that during a disciplinary meeting, Walker instructed her to "sit or kneel."  A review of Allen's deposition transcript, however, puts the comment in a different light.  As Allen herself testified, when she arrived at the disciplinary action she asked Walker for permission to sit down, and Walker responded, "oh, you can sit or kneel, whichever suits you best."  *Id.* at 116.

### D.   Circumstantial Evidence

In addition to the proofs which Allen claims shows direct evidence of discrimination, Allen also argues she can show circumstantial evidence of discrimination because two other Lincare employees, one an administrative assistant, the other an infusion nurse, also had attendance problems but were not dismissed.  Lincare responds that those employees were not similarly situated as their employment problems were not as severe, and unlike, Allen, there were no other issues regarding their performance or attitude.

### E.  Overtime Claim

Allen alleges that she was an hourly employee at the rate of $34 per hour and that Lincare violated the FLSA by failing to pay her overtime.  Lincare responds that Allen was paid an annual salary of $70,720, as well as a $20 stipend when she was on call on a week night, and $50 when on

call on a Saturday or Sunday, as well as pay on an hourly basis at $34 per hour when she saw patients while on call, or when she worked an extended work day.  Allen argues that her pay records show that she was always compensated at $34 per hour, regardless of hours worked.  The matter is ripe for decision on summary judgment as both parties have submitted earnings statements for the court's review, as well as deposition testimony of Allen, Walker, Hyde, and Botello, (Doc. 29, Ex. 2-4, 6), the affidavit of Lincare's Head of Payroll, Shiraz Mohammed,  (Doc. 32, Ex. 3), and other evidence relevant to the court's determination.

## II. Standard of Law

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

*see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with

-10-

"specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

### III. Analysis

**A.    Race Discrimination**

The court first addresses Allen's claims of race discrimination. A plaintiff asserting a race discrimination claim must produce either direct or indirect evidence of bias. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (Title VII); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462-63 (2001) (ELCRA). Although a plaintiff need not present both direct and circumstantial evidence of bias, in this case, Allen seeks to proceed under both theories. For the reasons discussed below, under either method of proof, Allen has failed to raise a genuine issue of material fact in support of her race discrimination claim. Accordingly, Defendant is entitled to summary judgment.

### 1. Direct Evidence

The court first considers Allen's claim that she has submitted direct evidence of discrimination sufficient to create a genuine issue of material fact. For the reasons set forth below, Allen has failed to do so. Direct evidence is "evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Allen claims she has come forward with direct evidence of discrimination based on the following comments by supervisors: (1) Walker's "ebola" comment, (2) Walker's request that Allen not touch her, and (3) Hyde's comment that Allen could sit or kneel during a disciplinary meeting.[1] Allen has failed to link any of the allegedly discriminatory comments to her discharge. All of the comments are racially neutral and do not prove racial discrimination. The Sixth Circuit has explained that in order to constitute direct evidence of discrimination, the

---

[1] In her argument, Allen has not claimed that management's failure to satisfactorily respond to her complaint against Van Berkel gives rise to a finding of discrimination. Even if the court were to consider this allegation, it would not change the court's conclusions here as Allen has not shown that the incident gives rise to an inference of racial bias, or is in any way connected to her termination.

evidence must prove discrimination without the assistance of any inferences.  *Id.*  That situation does not exist here in relation to any of Allen's proofs.

Allen claims the "ebola" comment was particularly offensive. According to Walker's testimony, the comment was meant to be funny because Allen was wearing a surgical mask.  But even taking as true Allen's assertion that she was not wearing a mask at the time of the comment, the "ebola" virus, although originating in Africa, can strike anyone, and has, regardless of race.  Thus, it is not clear that the illness has any racial component or that reference to that particular illness would have any racial overtones.  Even if the "ebola" virus could be somehow be linked to African Americans in particular, Walker's offhand comment that Allen was the "ebola" nurse is not evidence that Allen was terminated because of her race.  Similarly, Walker's alleged request that Allen cease touching her does not suggest any racial bias, as it is the sort of request that could be made to any employee in the workplace, regardless of race, as it is only commonplace for a worker to wish to be free from unwanted touching from anyone.

Finally, the court considers Allen's accusation that Hyde told her to "sit or kneel" during a disciplinary meeting.  Hyde remembers the comment

-13-

differently, and recalls that Allen asked if she needed to "kneel at Lucy's [Walker's] feet" during their meeting.  (Doc. 28, Ex. 16).  Despite this discrepancy, because the court is required to construe the proofs in the light most favorable to the nonmoving party, the court accepts Allen's version of the comment that it was Hyde who told her to "sit or kneel." Significantly, Allen's complaint that Hyde harbored racial bias towards her is undermined by the fact that Hyde conducted her employment interview and made the decision to hire her.  (Doc. 33, Pl. Dep., Ex. 1 at 133).  Also, the comment is considered in the context of their meeting, in which Hyde claims Allen was hostile, (Doc. 28, Ex. 16), and Allen admits she walked out of the meeting after her supervisor told her she was not dismissed, then quit work for the day claiming she was ill.  (Doc. 33, Pl. Dep., Ex. 1 at 117). Allen also testified at her deposition that Hyde was always "nasty" to her. *Id.* at 133.  Even if Allen's subjective belief that Hyde was "nasty" to her were true, general unpleasantness is not direct evidence of racial discrimination.  Like the comments discussed above, Hyde's stray and isolated comment to "sit or kneel" does not prove, nor lead to the inference, that Allen's race was the motivating reason for her discharge.

Having determined that none of the three comments Allen relies upon to prove race discrimination are sufficient to do so, the court turns now to

Allen's argument that allegedly unfair nursing assignments, which allegedly treated her less favorably than non-African American nurses, constitute direct evidence of discrimination. The court does not agree that even if true, this would amount to direct evidence of discrimination, as the fact finder would still have to infer that the allegedly unfair assignments were racially motivated. Thus, this allegation is more appropriate to consider using the method for analyzing circumstantial evidence. The point is moot, however, as whether analyzed under the direct or circumstantial method, Allen has failed to show that nursing assignments were unfair, let alone, based on race. Lincare has submitted nursing clinical activity logs which demonstrate that Allen was treated the same as other infusion nurses in receiving assignments to perform IG treatments. (Doc. 34, Ex. B). In addition, Allen has failed to refute Hyde's nursing study which shows that nursing assignments were fair in terms of time and travel. (Doc. 28, Ex. 26). Having failed to show that assignments were unfair, Allen cannot rely upon nursing assignments to prove racial discrimination.

**2.    Circumstantial Evidence**

Having failed to raise a genuine issue of material fact of race discrimination under the direct method, the court now turns to Allen's circumstantial evidence. Absent direct evidence of discrimination, claims

brought pursuant to Title VII and ELCRA are subject to the *McDonnell Douglas/Burdine* tri-partite burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981). Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine*, 450 U.S. at 253. "To establish employment discrimination, a plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was qualified for his job; (3) she suffered an adverse employment decision; and (4) she was treated differently than similarly situated non-protected employees." *Laster, supra*, 746 F.3d at 727. Should plaintiff satisfy the above elements, defendant has the burden of proving a legitimate, nondiscriminatory business reason for terminating plaintiff. *Jackson v. VHS Detroit Receiving Hosp.*, 814 F.3d 769, 776 (6th Cir. 2016). "Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* at 779. (citation and internal quotation marks omitted).

In this case, as is typically true, Allen satisfies the first three elements. The critical inquiry for the court is whether Allen was treated

-16-

differently than similarly situated non-protected employees.  In order to be
similarly situated, the employees must have engaged in misconduct of
comparable seriousness.  *Jackson*, 814 F.3d at 777.  The allegedly
similarly situated employees must have "engaged in the similar conduct,
without such differentiating or mitigating circumstances that would
distinguish their conduct or the employer's treatment of them for it."
*McMillan v. Castro*, 405 F.3d 405, 413 (6th Cir. 2005).

Allen argues two other employees, Renee Palmer and Luvina Snider,
had similar attendance problems but were not fired.  An analysis of those
employee's positions, however, leads to the conclusion that they were not
similarly situated.  The first employee identified by Allen, Palmer, was not
an infusion nurse, but an administrative assistant.  Unlike Allen, she was
not charged with reporting to the homes of patients in need of timely and
often critical medical attention.  In addition, her absenteeism did not rise to
the level of Allen's attendance problems as she only missed five days for
which she received, much like Allen did, a documented verbal warning.  As
to Snider, she is also distinguishable.  She was absent half as many days
as Allen while she was caring for her sick mother who had cancer, and
although she received a final written warning for attendance problems, her
attendance improved, likely because her mother died.  In addition, neither

Palmer nor Snider had any attitude problems as identified in Allen's case. Accordingly, Allen has failed to raise a genuine issue of material fact that she was treated differently than similarly situated employees.

Even if Allen could prove that she was treated differently than similarly situated employees, Lincare has come forward with proof that it had a legitimate nondiscriminatory reason for her discharge. Allen has not refuted Lincare's proofs that Allen missed nineteen days of work in nine months, and prior to her termination, was both informally and formally, warned on multiple occasions that her absenteeism could be grounds for termination. Allen also has failed to rebut Lincare's proofs that Allen had a poor attitude, and repeatedly complained about scheduling and nursing assignments. Allen attempts to show pretext by arguing that the disciplinary write-ups contained false information. In fact, the disciplinary documents contain some typographical errors and misstate some of the days Allen was absent, but Allen has not disputed that she was absent nineteen times in the nine months following her probationary period. Thus, Allen has failed to establish pretext. For the foregoing reasons, Lincare is also entitled to summary judgment on Allen's race discrimination claims under the circumstantial method.

**B.    Retaliation Claims**

The court turns now to Allen's claim she was discharged in retaliation for filing an internal grievance to management and an EEOC complaint. Lincare denies that Allen filed an internal grievance because Allen expressed a desire to withdraw her complaint on October 24, 2014, when she sent Human Resources Manager Linda Feller the following e-mail:

> When I spoke with Susie I told her I thought I may Have (sic) been decriminated (sic) against.  I felt that I was not being assigned any of the treatment patients and they were only being given to the others (sic) nurses who [are] white.  I just happened to be the only AA nurse.  I think this was more work discrimination and not race.  I have spoken to Krista and Lucy and have since been assigned these patients after the lost (sic) of many nurses.  I really don,t (sic) feel this needs to be handled as race and don,t (sic) want to pursue this in that manner.  There was a comment made to me by my nursing manager when introducing me to a new employee which I took as an insult but later she informed me she was just joking.  I did not take it as a joke at the time.  Since, we have spoken on a more private level and this has been resolved.  I decline to move forward at this time.

(Doc. 28, Ex. 30).  For purposes of this order, the court accepts Allen's allegation that she filed an internal grievance, and the fact that she later withdrew her complaint, does not prohibit Allen from arguing Lincare retaliated against her for filing such a complaint.

Title VII prohibits an employer from retaliating against an employee "because he has made a charge" of discrimination.  42 U.S.C. § 2000e-

3(a). Michigan's ELCRA includes a similar provision, *see* MCL §

37.2701(a) which is analyzed under the same standard. *Kuhn v.*

*Washtenaw Cty.*, 709 F.3d 612, 627 (6th Cir. 2013). As with a

discrimination claim, a plaintiff can prove retaliation with direct or

circumstantial evidence. Again, it appears that Allen seeks to proceed

under both methods here. For the same reasons Allen has failed to show

race discrimination based on direct evidence, Allen has failed to establish

any direct evidence of retaliation. The court now considers whether Allen's

retaliation claim based on circumstantial evidence survives Lincare's

motion for summary judgment. Once again, the court analyzes the claim

under the *McDonnell Douglas* framework.

Under that paradigm, a plaintiff has the initial burden to establish a

prima facie case of retaliation under Title VII by establishing that: (1) she

engaged in protected activity when she made her discrimination complaint;

(2) defendant knew about her exercise of the protected activity; (3)

defendant thereafter took adverse employment action against her; and (4)

there was a causal connection between the protected activity and the

adverse employment action. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th

Cir. 2013). If plaintiff establishes a prima facie case, the burden of

production shifts to defendant to "articulate some legitimate,

nondiscriminatory reason for [its action]." *McDonnell Douglas*, 411 U.S. at

802. If the defendant shows a legitimate nondiscriminatory reason for the

adverse employment action, the burden shifts back to the plaintiff to prove

that the proffered reason was pretext for discrimination. A plaintiff can

prove pretext three ways: "by showing that the proffered reason (1) has no

basis in fact, (2) did not actually motivate the defendant's challenged

conduct, or (3) was insufficient to warrant the challenged conduct."

*Johnson*, 319 F.3d at 866 (citation and internal quotations omitted).

In addition to the circumstantial and direct evidence considered in the

context of Allen's race discrimination claim, Allen also relies on the

proximity in time between the filing of her discrimination claims and her

termination to prove retaliation. The Sixth Circuit has recognized that in

order to show a causal connection, a plaintiff must show "a temporal

connection coupled with other indicia of retaliatory conduct." *Little v. BP*

*Exploration & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001). Temporal

proximity alone is not enough. *Id.* at 363-64. Also, where an employer

comes forward with proof that it had an intervening legitimate reason to

take an adverse employment action against the plaintiff, this dispels

whatever inference might be gleaned from the temporal proximity of the

adverse employment action and the employee's complaints of discrimination.  *Kuhn,* 709 F.3d at 628.

In support of her retaliation claim, Allen seeks to rely on the same evidence discussed in her race discrimination claim to prove causation, along with the proximity in time to her termination and her internal and EEOC complaints.  For the same reasons discussed earlier in this opinion, Allen has failed to raise a genuine issue of material fact to prove causation between the filing of her race discrimination claims both internally, and with the EEOC, and her termination.

The temporal proximity between her protected activity and termination is not enough to create an inference of retaliation sufficient to survive Lincare's motion for summary judgment.  At oral argument, the parties disputed how close in time Allen's termination was to her protected activity. Lincare argued that it knew of Allen's EEOC complaint which she filed in December, 2014, by at least by January, 2015, some six months prior to her termination.  Lincare argues that six months is too remote in time for the temporal proximity to give rise to an inference of retaliation. Allen, on the other hand, argues that Lincare did not know about the EEOC complaint until much later, possibly just days before her termination when it received notice of the EEOC's dismissal of her complaint.  A review of the

record, however, supports Lincare's version of events.  On December 29,

2014, the EEOC gave Lincare notice of Allen's EEOC complaint.  (Doc. 34,

Ex. C).  On January 28, 2015, Lincare's Human Resources Manager, Linda

Feller, responded to the EEOC charge.  (Doc. 34, Ex. D)  Given the six

months that lapsed between the time when Lincare learned of Allen's

EEOC complaint and the time that it terminated her, this is simply too long

to give rise to an inference of retaliation without any corroborating

evidence, which is lacking here.  For these reasons, Lincare is entitled to

summary judgment on Allen's retaliation claims.

## C.    Overtime Claim

The court now turns to the parties cross-motions for summary

judgment as to Allen's FLSA claim for alleged overtime violations.[2]  Allen

argues she is owed 492 hours of unpaid overtime.  Having carefully

---

[2]In her Complaint and motion for partial summary judgment, Allen
also seeks to proceed under Michigan's Minimum Wage Act of 1964
("MWA"), but as Lincare points out in its response brief, that law has been
replaced by the Michigan Workforce Opportunity Wage Act ("MWOWA"),
Mich. Comp. Laws § 408.411 *et seq.*  Allen does not address Michigan law
in her reply brief and it appears she has abandoned her state law overtime
violation claim.  Even if she does intend to proceed under Michigan law,
courts have recognized that analysis under the MWOWA is analogous of
FLSA claims.  *Dikker v. 5-Star Team Leasing*, 243 F. Supp. 3d 844, 854
n.3 (W.D. Mich. 2017).  Thus, any state law claims must be decided the
same way as her FLSA claim.

considered all of the evidence presented, the court concludes that Allen was a salaried employee, exempt from the overtime provisions of the FLSA. Lincare's payroll status ticket states that Allen would be paid an annual salary of $70,720 on a bi-weekly basis. (Doc. 32, Ex. 1). Also, her job description identified her as an "exempt" employee. (Doc. 32, Ex. 2).

Allen was paid a bi-weekly salary of $2,720. There were no deductions for partial days worked, for example, if Allen left work early, she still received full pay for 80 hours of work. However, if Allen was absent a full day for personal reasons or for a sick day, it was deducted from her salary. Allen was not entitled to sick leave until she had been employed for a full year, which she had not. Allen also received a $20 stipend for days she was on call during the week, and a $50 bonus for a Saturday or Sunday. In addition, while on call or when working additional hours in the work week, such as when completing a patient's infusion required her to work more than eight hours in a day, she was paid $34 per hour straight time in addition to her annual bi-weekly salary.

The court recites an example of how this method played out in several examples. For instance, during the pay period ending November 16, 2014, Allen was paid her guaranteed minimum biweekly pay of $2,720, received an on-call stipend of $120 (for two weekend days and one week

night), was paid 2.5 hours at $34 per hour for on-call time spent with a patient.  (Doc. 32. Ex. 4).  Similarly, for the pay period ending on March 8, 2015, Allen received her guaranteed minimum salary of $2,720 plus an on-call stipend of $160 (for two weekend days and three weekdays) as well as payment for 23 hours of actual on-call time at $34.  *Id.*  In calculating Allen's pay, Lincare deducted full day personal or sick day absences from her salary.  As discussed previously, Allen did not qualify for Lincare's sick day policy because she had not been employed for a full year.

The FLSA prohibits an employer from employing a non-exempt employee for more than 40 hours in a week, unless the employee is compensated at time and a half times the hours worked at the regular rate in excess of 40 hours.  29 U.S.C. § 207(a).  Persons employed in a bona fide professional capacity are exempt from overtime pay requirements. *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 837 (6th Cir. 2002)(citing 29 U.S.C. § 213(a)(1)). "The employer has the burden of proving that an employee satisfies any exemptions under the FLSA, and exemptions under the FLSA are narrowly construed against the employer." *Id.* (citations omitted).  The regulations interpreting the FLSA provide a "short test" for determining whether professional employees "who are compensated on a salary or fee basis at a rate of at least $250 per week

exclusive of board, lodging, or other facilities" are exempt from the FLSA's overtime provisions. *Id.* (citing 29 C.F.R. § 541.315(a)). The parties agree that the "short test" governs Allen's claim here. Under that test, Lincare must prove: "(1) that [Allen's] primary duties consisted of the performance of work "requiring knowledge of an advanced type in a field of science or learning;" (2) that her "work require[d] the consistent exercise of discretion and judgment;" and (3) that she was paid "on a *salary or fee basis* at a rate of at least $250 per week exclusive of board, lodging, or other facilities." *Id.* at 837-38 (citing 29 C.F.R. § 541.315(a)). Allen concedes that her duties as a highly skilled registered nurse satisfy the first two prongs of this test. She disputes only whether she was paid on a salary basis as defined by the FLSA regulations.

Under the applicable Department of Labor regulations, Allen was a salaried employee, and the fact that she was paid additional amounts for on-call and work in excess of eight hours a day or 40 hours in a week does not alter this conclusion. The regulations define the salary based test as follows:

> (a) General rule. An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject

to reduction because of variations in the quality or quantity of the work performed.

(1) Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no work.

29 C.F.R. § 541.602.  Lincare argues that two of the exceptions set forth in

§ 541.602 (b)(1) and (2) apply here.  Those sections provide:

(b) Exceptions. The prohibition against deductions from pay in the salary basis requirement is subject to the following exceptions:

(1) Deductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability. Thus, if an employee is absent for two full days to handle personal affairs, the employee's salaried status will not be affected if deductions are made from the salary for two full-day absences. However, if an exempt employee is absent for one and a half days for personal reasons, the employer can deduct only for the one full-day absence.

(2) Deductions from pay may be made for absences of one or more full days occasioned by sickness or disability (including work-related accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability. The employer is not required to pay any portion of the employee's salary for full-day absences for which the employee receives compensation under the plan, policy or practice. Deductions for such full-day absences also may be made before the employee has qualified under the plan, policy or practice, and after the employee has exhausted the leave allowance thereunder.

29 C.F.R. § 541.602(b)(1)(2).  Courts have found similar deductions for full-day absences to be consistent with exempt status.  *See Martinez v. Hilton Hotel Corp.*, 930 F. Supp. 2d 508, 521 (S.D.N.Y. 2013).  Under the above provisions, Lincare's deductions of full-day absences for Allen's use of personal days, or sick days, for which she was ineligible under Lincare's policy requiring a year of employment prior to entitlement, does not alter the conclusion that Allen was a salaried employee.

Also, Lincare's policy of paying additional compensation for on-call work or work in excess of 40-hours per week or eight hours per day, does not transform Allen into an hourly employee.  The regulations specifically provide that such additional compensation is consistent with an employee's status as an exempt salaried employee as long as the employee is "guarante[ed] the minimum weekly-required amount paid on a salaried basis:"

> (a) An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis. Thus, for example, if the current weekly salary level is $913, an exempt employee guaranteed at least $913 each week paid on a salary basis may also receive additional compensation of a one percent commission on sales. An exempt employee also may receive a

percentage of the sales or profits of the employer if the employment arrangement also includes a guarantee of at least $913 each week paid on a salary basis. Similarly, the exemption is not lost if an exempt employee who is guaranteed at least $913 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis), and may include paid time off.

29 C.F.R. § 541.604.  Courts have applied this regulation to find that an employer can pay additional compensation beyond the normal workweek without jeopardizing exempt status.  *See Rivera v. Anjost Corp.*, 645 F. App'x 30, 31 (2d Cir. 2016).

Allen argues that because she was paid different amounts each pay period, she must be an hourly employee.  But Allen was paid differently because of her many absences for personal or sick days which may be deducted without changing her exempt status.  Also, Allen's bi-weekly pay fluctuated because she was paid a stipend for on-call work, and paid additional compensation for work in excess of her normal workday or workweek, neither of which alters her exempt status because she was still guaranteed her bi-weekly salary.

Allen argues that *Elwell* supports her overtime violations claim; however, that case is distinguishable.  *Elwell* involved home health care nurses who were paid a fee per visit, as well as hourly compensation for visits that lasted more than two hours.  276 F.3d at 835.  The Sixth Circuit found that the regulations did not permit an employer from paying additional hourly compensation for fee based work as the regulations specifically require that in order to qualify as "fee basis" employment under the FLSA, the employee must be paid for a completed task "*regardless* of the time required for its completion."  *Id.* at 838 (quoting 29 C.F.R. § 541.313(b)).  By contrast, the Sixth Circuit recognized the salary basis regulation, which applies here, explicitly permits hybrid compensation schemes as it provides, "additional compensation besides the salary is not inconsistent with the salary basis of payment."  *Id.* at 838-39 (citing 29 C.F.R. § 541.118(b) recodified in 2004 as 29 C.F.R. § 541.604).

Allen's reliance on *Martin v. W.E. Monks & Co.*, 805 F. Supp. 500 (S.D. Ohio 1992) also fails to support her position.  *Martin* is distinguishable because the employees in that case were required to deduct hours when they worked less than a full day, were required to make up hours in the following week when they worked less than 40 hours the previous week,

-30-

and were required to assign part-time absences to vacation or sick time. *Id.* at 505.

Allen relies on her employment application to support her claim that she was an hourly employee because she listed her salary requirement as $34 per hour.  (Doc. 32, Ex. 11).  The employment application is not dispositive of how Lincare actually paid her; it is simply her request for a certain minimum pay.  Allen contends that Walker's and Hyde's deposition testimony support her claim that she was an hourly, not a salaried employee, but when considered in context, their testimony actually supports the conclusion that she was a salaried employee.  Walker testified, "The nurses were all salaried nurses.  If they worked past their 8-hour or 10-hour day or 12-hour day . . . they did get paid a calculated hourly rate for any time above those regular hours."  (Doc. 32, Ex. 10 at 163-64).  Similarly, Hyde testified as follows:

> Question:   Do you know how much Ms. Allen was earning per hour, during her employment?
>
> Mr. Ruemenapp: Object to the form.
>
> Answer:   I believe it was $34.00 an hour.
>
> Question:   And she was paid for how many hours she worked, is that correct?

Answer:    Yes and no.  She listed it as $34.00 an
hour, but she was still a salary
employee.  So doing the math would be
the breakdown of that.  She wasn't paid
hourly per se, but when she would
submit her additional on-call or overtime
this is the rate that would be reflected.

(Doc. 32, Ex. 12 at 33-34).  Allen also relies on an e-mail written by Paula

Adams of Human Resources who responded to an inquiry as to whether it

was appropriate to deduct Allen's holiday pay when she worked Good

Friday but called in sick the Monday after Easter.  Adams responded, "I

agree - we pay her work what she worked –  or if she's exempt for the day

–  but she doesn't qualify for the holiday pay."  (Doc. 35, Ex. 1).  Adams'

response that Allen was not eligible for holiday pay where she did not work

the Monday after Easter is consistent with the Employee Handbook's policy

regarding holiday pay, and does not alter Allen's exempt status.

Specifically, the handbook provides:

All eligible employees will receive 10 paid holidays during the
calendar year.  To be eligible for holiday pay, you must be on
active status and work (or be on pre-approved time off) your full
scheduled day prior to and following the holiday.

Generally, holidays falling on a Saturday will be observed the
preceding Friday and holidays falling on a Sunday will be
observed on the following Monday.

(Doc. 32, Ex. 13 at 7). Adams specifically responded that if Allen was deemed "exempt" she was paid for the day, which would be consistent with her status as a salaried employee. A review of Allen's paystub for the pay period ending on April 5, 2015, which would have included the Good Friday and Easter Monday in question, show that Allen was paid for six days of work at the regular rate, and one vacation day, but not holiday pay. (Doc. 29-6 at PgID 995). Also, Allen's letter to Lincare that she was not paid her expected overtime in March and April, 2015 does not alter the court's analysis here. In sum, Allen worked as a salaried exempt employee and is not entitled to overtime pay. Accordingly, Allen's motion for partial summary judgment shall be denied.

## IV. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (Doc. 28) is GRANTED. Plaintiff's cross-motion for partial summary judgment (Doc. 29) is DENIED.

**IT IS SO ORDERED**.

Dated: January 10, 2018

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 10, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk